1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ROBERT L. HAYNES,

11              Petitioner,              No. 2: 03-cv-0356 LKK KJN P

12        vs.

13   ANTHONY LAMARQUE,

14              Respondent.              FINDINGS AND RECOMMENDATIONS

15   _____/

16              Petitioner is a state prisoner proceeding without counsel with a petition for writ of

17   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 1999 convictions for ten

18   counts of lewd conduct and other sexual offenses.  Petitioner is serving a sentence of 80 years in

19   prison.

20              This action is proceeding on the amended petition filed November 17, 2005.

21   (Dkt. No. 34.)  Petitioner raises the following claims: 1) jury instruction error; 2) prosecutorial

22   misconduct; 3) no valid waiver of right to a jury trial as to his prior conviction; 4) trial court

23   improperly denied petitioner's request to admit evidence.

24              After carefully reviewing the record, the undersigned recommends that the

25   petition be denied.

26   ////

II.  Anti-Terrorism and Effective Death Penalty Act ("AEDPA")

In <u>Williams (Terry) v. Taylor</u>, 529 U.S. 362 (2000), the Supreme Court defined the operative review standard in a habeas corpus action brought pursuant to 28 U.S.C. § 2254. Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law.  <u>Id</u>. at 405.  "Contrary to" clearly established law applies to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law; or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. <u>Id</u>. at 407-08.  It is this prong of the AEDPA standard of review which directs deference be paid to state court decisions.  While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  <u>Id</u>. at 410-11 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority.  <u>Woodford v. Viscotti</u>, 537 U.S. 19 (2002).

"Clearly established" law is law that has been "squarely addressed" by the United States Supreme Court.  <u>Wright v. Van Patten</u>, 552 U.S. 120 (2008).  Thus, extrapolations of settled law to unique situations will not qualify as clearly established.  <u>See e.g.</u>, <u>Carey v. Musladin</u>, 549 U.S. 70, 76 (2006) (established law not permitting state sponsored practices to

1  inject bias into a criminal proceeding by compelling a defendant to wear prison clothing or by

2  unnecessary showing of uniformed guards does not qualify as clearly established law when

3  spectators' conduct is the alleged cause of bias injection).

4          The state courts need not have cited to federal authority, or even have indicated

5  awareness of federal authority, in arriving at their decision.  Early v. Packer, 537 U.S. 3 (2002).

6  Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an

7  unreasonable application of, established Supreme Court authority.  Id.  An unreasonable error is

8  one in excess of even a reviewing court's perception that "clear error" has occurred.  Lockyer v.

9  Andrade, 538 U.S. 63, 75-76 (2003).  Moreover, the established Supreme Court authority

10  reviewed must be a pronouncement on constitutional principles, or other controlling federal law,

11  as opposed to a pronouncement of statutes or rules binding only on federal courts.  Early v.

12  Packer, 537 U.S. at 9.

13          However, where the state courts have not addressed the constitutional issue in

14  dispute in any reasoned opinion, the federal court will independently review the record in

15  adjudication of that issue.  "Independent review of the record is not de novo review of the

16  constitutional issue, but rather, the only method by which we can determine whether a silent state

17  court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

18  2003).

19          When reviewing a state court's summary denial of a claim, the court "looks

20  through" the summary disposition to the last reasoned decision.  Shackleford v. Hubbard, 234

21  F.3d 1072, 1079 n. 2 (9th Cir. 2000).

22  III.  Background

23          The opinion of the California Court of Appeal contains a factual summary.  After

24  independently reviewing the record, the undersigned finds this summary to be accurate and

25  adopts it herein.

26  ////

In January 1999, when she was 15, Daniele R. took the bus from Truckee to Sacramento and then the train to San Francisco.  Defendant was the bus driver.  When the bus stopped in Roseville, Danielle got off to buy her train ticket.  While she stood in line and got her ticket, defendant made a phone call.  Afterwards he told Danielle his boss said she had been seen concealing a weapon on her person in Truckee.  He said it would be sorted out in Sacramento.  Daniele told him she did not have a weapon.

When the bus arrived in Sacramento, defendant told Daniele she had to wait for the police to search her.  She responded that she had to catch her train and patted her clothes and lifted her sweater to show she had no weapon.  Defendant told her he had to do a further search, a cavity search.  He asked her if she would let him do that and she said yes.  He told her to get back on the bus and sit in the back.

He had her lay down on the seat and told her to pull down what she was wearing under her skirt.  He poked her vagina with his finger (counts one and two).  She pulled away.  Then he put his finger in her butt area; it went a little bit inside her anus and she sat up (counts three and four).  She put on her clothes and defendant let her leave the bus.  Daniele was confused and embarrassed; she was not sure what defendant had done was wrong until she spoke to a friend's mother and her mother.

Two days later 17-year-old Jessica H. Took the bus from Sacramento to Reno with her 2-year-old daughter.  She talked with the driver, defendant, about her daughter and his children.  Although she did not hear the phone ring, defendant took a phone call before the bus got to Truckee.  He told Jessica he had spoken with his boss and someone reported a blonde getting on the bus with a concealed weapon.  She was the only blond on the bus.

Jessica told him she did not have a gun, she did not like guns, and he could search her luggage.  Defendant responded he was not allowed to search her luggage.  Defendant said his boss wanted him to pull over and have the highway patrol do a cavity search.  Jessica was scared.  Defendant told her he believed she did not have a weapon, but that he had to do something or he would lose his job.  He asked her if she knew what a cavity search was.  She said no and he told her she would have to pull down her pants and they would stick their fingers in her vagina and anus to make sure she did not have anything.  He told her Mexican girls hide knives in their vaginas.

Defendant continued to tell her he had to do something.  He said it was cold outside and if he pulled over for the search everyone would have to get out and see it.  Jessica lied and told him she was pregnant.  He told her she could go to jail.  She told him she would go to Juvenile Hall as she was only 17.  Defendant told her that instead of having the highway patrol do the search, she could pull down her pants and give herself a search in front of him.  Jessica was terrified and did not say anything.  There was a long silence, then defendant calmly said something had to be done (counts five and six).

Defendant missed Jessica's stop in Reno and went to Sparks, where the only other passenger disembarked.  Defendant said he did not know how he missed Reno.  Jessica said she would take a taxi.  Defendant told her that would cost $30 and he

would give her a ride because he had to stop there.  On the way back to Reno, defendant said he was tired and was going to pull over and take a nap.  He did not stop until Reno, where Jessica got off.  She called her mother and the next day talked to the Sacramento police.

Renita H. is defendant's ex-wife.  She and defendant had two children, Marqueisha, 12, and Robert, 7.  She was shocked when she learned what defendant had been arrested for and asked the children if defendant had ever touched them.  At first they denied any touching, but eventually Marqueisha disclosed that defendant had touched her.

At trial Marqueisha testified she called her private parts vagina and booty.  Defendant had touched them with his finger and his pee-pee (penis).  He touched her vagina with his pee-pee once or twice; he touched her vagina with his finger five times and touched her booty with his fingers twice (counts seven through ten).  He told her he was examining her and told her not to tell.

The first time defendant touched her vagina was when she was seven or eight and going to bed.  Her brother was asleep in the room.  Defendant pulled down the covers, lifted her nightgown, and touched her with his fingers (count seven).  The last time was when she was 10 or 11.  He came into her room and got her out of bed and took her into the living room.  He told her to take off her clothes and lay down.  He got on top of her and put his penis inside her vagina; he was moving.  She tried to get up but there was too much weight (count eight).  Afterwards she went to the bathroom and wiped herself with a towel; she saw blood.

Marqueisha also recalled a time defendant came into her room, pulled down her pants and put his finger in her "booty."  It hurt (count nine).

Marqueisha became very upset while testifying and the court had to take breaks to allow her to regain her composure.  She testified it made her angry and sad to testify.  She was angry at her father.

After Marqueisha's testimony the district attorney amended the information, dismissing six counts and reducing two others from forcible lewd acts to nonforcible.

Two other witnesses testified pursuant to Evidence Code section 1101, subdivision (b) and section 1108 about prior criminal acts by defendant in 1995.  Sherry C. testified she went to the Circle K in West Sacramento for milk one night.  Defendant was behind the counter and on the phone.  He told her a security man saw her steal and asked to search her purse.  She went into an office and emptied her purse.  Defendant then said the stolen goods were down the front of her pants and he would have to search her.  Sherry asked for a female officer.  Defendant made a call and reported a female officer was on the way.  After a long wait, he told her if she would drop her pants and show him, he would let her go.  Sherry said she would wait for the officer.  When a delivery truck arrived and the driver entered the store, defendant let her go.

Rosalia C. also went to the Circle K.  She went to the counter with items and defendant told her to wait while he grabbed the phone.  She did not hear the phone

ring.  Defendant reported someone had told him she had taken candy and put it inside her shirt.  Rosalia denied the theft and opened her sweater to show defendant.  Defendant said he had to take her into another room to search her.  He had her put her hands on the table while he searched her chest area, back and buttocks.  When someone walked in, defendant seemed nervous and told her to leave.

Defendant denied touching or assaulting Daniele.  He did mistakenly skip Reno when Jessica was on the bus.  He only spoke with her about pulling the bus over for the highway patrol to remove two drunks.  He did not attempt to touch or assault her.  Defendant testified he loved his daughter and denied molesting her.  He claimed his ex-wife had used the children as a weapon.  Defendant admitted he was convicted in 1996 of two counts of false imprisonment and in 1997 of assault with a firearm.

(Respondent's Lodged Document 4, pp. 2-7.)

IV.  Discussion

A.  Claim One – Jury Instruction Error

Petitioner argues that the trial court erred in giving CALJIC 17.41.1 because it impinged on his Sixth and Fourteenth Amendment rights to a unanimous jury.  CALJIC 17.41.1 provides as follows:

The integrity of a trial requires that jurors, at all times during their deliberations, conduct themselves as required by these instructions.  Accordingly, should it occur that any juror refuses to deliberate or expresses an intention to disregard the law or to decide the case based on penalty or punishment, or any other improper basis, it is the obligation of the other jurors to immediately advise the Court of the situation.

(CT at 224.)

Petitioner's challenge to CALJIC No. 17.41.1 is foreclosed by the decision of the Ninth Circuit Court of Appeals in Brewer v. Hall, 378 F.3d 952, 955-57 (9th Cir. 2004).  In Brewer, the Ninth Circuit held that, regardless of the "constitutional merits" of CALJIC No. 17.41.1, federal habeas corpus relief was unavailable with respect to a challenge to that jury instruction because there is "no Supreme Court precedent clearly establishing" that its use violates a defendant's constitutional rights.  378 F.3d at 955-56.  Here, as in Brewer, petitioner "has pointed to no Supreme Court precedent clearly establishing that CALJIC 17.41.1 - either on

6

1   its face or as applied to the facts of his case - violated his constitutional rights." Id. at 957.

2           Moreover, to the extent that petitioner argues that the instruction denied him the

3   right to jury nullification, there is no federal authority for the proposition that such a right exists.

4   See Merced v. McGrath, 426 F.3d 1076, 1079-80 (9th Cir. 2005) (equating jury nullification with

5   "a violation of a juror's sworn duty to follow the law as instructed by the court" that would, in

6   certain circumstances, justify dismissal from the jury); Crease v. McKune, 189 F.3d 1188, 1194

7   (10th Cir. 1999) (finding no federal constitutional right to jury nullification); see also United

8   States v. Navarro-Vargas, 408 F.3d 1184, 1198 (9th Cir. 2005) (holding that federal criminal

9   defendants are not entitled to instructions allowing jury nullification); United States v. Powell,

10  955 F.2d 1206, 1213 (9th Cir. 1992) (same).

11          After conducting an AEDPA review, the undersigned finds that this claim is

12  without merit.  Accordingly, this claim should be denied.

13          B.  Prosecutorial Misconduct

14          Petitioner alleges that the prosecutor committed misconduct during closing

15  argument by referring to jurors by name.  The California Court of Appeal denied this claim for

16  the reason stated:

17          In closing argument the prosecutor stressed defendant's common plan in
            committing the offenses.  To illustrate the point, he broke defendant's conduct
18          down into steps and addressed jurors individually as to each step.  "I wish we
            could–where I could make this a participatory closing argument and ask you to
19          respond to me, so this is all just rhetorical, so don't say anything.  But if I said to
            [Juror–Redacted] and said what would be the first thing that this defendant would
20          do? [Juror redacted] responses would be, well, he would feign a phone call, he's
            getting a fake phone call.  If he saw somebody he wanted to sexually assault on or
21          about his presence, he'd fake it. [¶] Then I would ask [Juror–redacted], what
            would be the next thing."  Defense counsel objected to improperly pointing out
22          jurors and the court overruled the objection.  The prosecutor continued this line of
            argument, singling out jurors by name to argue defendant would accuse the young
23          woman of improper conduct, say he needed to search her, tell her law enforcement
            would be involved, and if the victim refused, tell her she could search herself or
24          disrobe.  Defense counsel later noted his objection to the singling out of jurors.

25          Defendant contends the prosecutor committed misconduct by referring to
            individual jurors by name.  He asserts this conduct violated his constitutional
26          rights by diminishing the neutrality of the jury and lessening the prosecutor's

                                                    7

1    burden of proof.

2    "[A]rguments should be addressed to the jury as a body and the practice of
     addressing individual jurors by name during the argument should be condemned
3    rather than approved,...." (People v. Wein (1958) 50 Cal.2d 383, 395, overruled
     on other grounds in People v. Daniels (1969) 71 Cal.2d 1119.) "[T]he courts have
4    generally disapproved of counsel's addressing a juror individually or by
     name during his argument." (75A Am.Jur.2d (1991) Trial, § 564, p. 146.) The
5    prosecutor should not have addressed his remarks to individual jurors by name
     and the trial court erred in overruling the objection.

6

7    Nevertheless, "it does not follow that such conduct is necessarily prejudicial in
     any given case." (People v. Wein, supra, 50 Cal.2d at pp. 395-396; accord
     Neumann v. Bishop (1976) 59 Cal.App.3d 451, 474 .) Referring to individual
8    jurors by name in closing argument is disapproved because it may be an appeal to
     the passions and prejudices of the jurors. (See People v. Davis (1970) 46 Ill2d
9    554, 560 [264 N.E.2d 140, 143]; State v. Ryerson (1955) 247 Iowa 385, 392-393
     [73 N.W.2d 757, 762].) An appeal to known or suspected prejudices or arousal of
10   passions may render unlikely a fair consideration of the evidence. (5 Witkin &
     Epstein, Cal. Criminal Law (3d ed. 2000) Criminal Trial, § 594, p. 851.) Where
11   the claim is misconduct in the prosecutor's argument to the jury, "the question is
     whether there is a reasonable likelihood that the jury construed or applied any of
12   the complained-of remarks in an objectionable manner. [Citation.]" (People v.
     Berryman (1993) 6 Cal.4th 1048, 1072-1073, overruled on another point in People
13   v. Hill (1998) 17 Cal.4th 800, 823, fn. 1.)

14   Referring to jurors individually by name is usually not found to be reversible error
     by itself. (See People v. Sawyer (1967) 256 Cal.App.2d 66, 78 ["Addressing
15   arguments to individual jurors as 'sir' and 'ma'am' was improper but not
     prejudicial."]) In Aponte v. State (1959) 30 N.J. 441 [153 A.2d 665], the
16   prosecutor addressed some jurors by name and referred to their specific religious
     beliefs in summation. The court found this conduct improper, and it contributed
17   to the finding of reversible error. The court noted, however, "If this were the sole
     issue in this case, it is doubtful that reversible harm could be found." (Id. at p.
18   448.)

19   While the prosecutor sought to involve the jurors in his argument about
     defendant's common scheme, nothing indicates an appeal to the passion or
20   prejudices of the juror singled out such as to make the trial unfair. The jury was
     instructed that the prosecutor's argument was not evidence. The evidence of a
21   common plan was very strong. There is no reasonable probability the jury would
     have reached a verdict more favorable to defendant absent these challenged
22   comments. (People v. Hart (1999) 20 Cal.4th 546, 619-620.)

23   (Respondent's Lodged Document 4, pp. 14-16.)

24        Prosecutorial misconduct rises to the level of constitutional deprivation only when

25   it "so [infects] the trial with unfairness as to make the resulting conviction a denial of due

26   process." Darden v. Wainright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo,

1   416 U.S. 637, 643 (1984)).

2          It is not enough that a prosecutor's remarks were undesirable or even universally

3   condemned. Darden v. Wainwright, 477 U.S. at 181 (1986). Rather, the relevant question is

4   whether they so infected the trial with unfairness as to make the resulting conviction a denial of

5   due process. Id.

6          For the reasons stated by the California Court of Appeal, the undersigned finds

7   that the at-issue argument (Reporter's Transcript at 530-31) did not so infect the trial with

8   unfairness as to make petitioner's conviction a violation of due process. While referring to the

9   jurors by name during closing argument is a disapproved practice, it is extremely unlikely that

10  the outcome of petitioner's trial would have been different had the prosecutor not made the

11  challenged argument.

12         After conducting an AEDPA review, the undersigned recommends that this claim

13  be denied.

14         C. Prior Conviction

15         Petitioner argues that his sentence enhancement based on his prior conviction

16  should be vacated because he did not waive his right to a jury trial for the prior conviction. The

17  background to this claim is contained in the opinion of the California Court of Appeal:

18         The information alleged that defendant had a conviction for assault with a firearm
           that made him subject to a five-year enhancement under Penal Code section 667,
19         subdivision (a) and a doubled sentence under Penal Code section 667, subdivision
           (e)(1) and section 1170.12, subdivision (c)(1). Defendant contends the prior
20         conviction should be vacated for two reasons. First, he contends he did not waive
           jury trial on the prior allegation....

21
           Defense counsel requested bifurcation and a court trial on the allegation of a prior
22         conviction. Defendant did not expressly waive a jury trial. Nor did he object
           when the jury was dismissed or when the court commenced trial on the prior.
23

24  (Respondent's Lodged Document 4, pp. 26-27.)

25         In Apprendi v. New Jersey, 530 U.S. 466 (2000), the Supreme Court made it clear

26  that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime

9

1  beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a

2  reasonable doubt."  530 U.S. at 490; accord Cunningham v. California, 549 U.S. 270, 274-75

3  (2007); Blakely v. Washington, 542 U.S. 296, 301 (2004).  The Apprendi court found that

4  recidivism was distinguishable from other matters employed to enhance punishment because

5  (1) "recidivism is a traditional, if not the most traditional, basis for a sentencing court's

6  increasing an offender's sentence," (2) "recidivism does not relate to the commission of the

7  [charged] offense[,]" and (3) prior convictions result from proceedings that include substantial

8  procedural protections.  530 U.S. at 488 (internal quotation marks, alterations and citations

9  omitted).  In carving out this "narrow exception" for prior convictions, the Apprendi court

10  explicitly declined to overrule its decision in Almendarez-Torres v. United States, 523 U.S. 224

11  (1998).  Apprendi, 530 U.S. at 489-90 ("Because Almendarez-Torres had admitted the three

12  earlier convictions for aggravated felonies - all of which had been entered pursuant to

13  proceedings with substantial procedural safeguards of their own - no question concerning the

14  right to a jury trial or the standard of proof that would apply to a contested issue of fact was

15  before the Court.... More important, ... our conclusion in Almendarez-Torres turned heavily upon

16  the fact that the additional sentence to which the defendant was subject was the prior commission

17  of a serious crime.") (internal quotation marks and citation omitted).

18          There is no clearly established federal law that requires a jury trial on the

19  existence of a prior conviction.  Accordingly, the denial of this claim by California Court of

20  Appeal was not an unreasonable application of clearly established Supreme Court authority.  This

21  claim should be denied.

22          D.  Denial of Request to Admit Evidence

23          Petitioner argues that the trial court violated his right to due process when it

24  would not allow him to offer evidence that Marqueisha could have been molested by a registered

25  sex offender.  Respondent argues that this claim is procedurally defaulted.

26  ////

Petitioner raised this claim on direct appeal before the California Court of Appeal, but did not raise it in his petition for review.  (Respondent's Lodged Documents 4, 5.)  Petitioner raised this claim, as well as his claim alleging violation of his right to a jury trial as to his prior conviction, in a habeas corpus petition filed in the California Supreme Court on August 30, 2004. (Respondent's Lodged Document 8.)  The California Supreme Court denied this petition by order citing In re Robbins, 18 Cal.4th 770, 780 (1998), and People v. Black, 35 Cal.4th 1238 (2005). (Id.)

Where a California Supreme Court order denying more than one ground rests on multiple citations, and the order does not specify which citation disposes of which ground, each citation must support a procedural default in order to bar federal review.  Calderon v. U.S. Dist. Court for Eastern Dist. Of Calif. (Bean), 96 F.3d 1126, 1131 (9th Cir. 1996);  Morales v. Calderon, 85 F.3d 1387, 1392 (9th Cir.1996) ("[A] procedural default based on an ambiguous order that does not clearly rest on independent and adequate state grounds is not sufficient to preclude federal collateral review.").

In re Robbins stands for the proposition that petitioner's petition is untimely. Thorson v. Palmer, 479 F.3d 643, 645 (9th Cir. 2007).   In People v. Black, 35 Cal.4th 1238 (2005), the California Supreme Court held that California's statutory scheme providing for the imposition of an upper term sentence did not violate the constitutional principles set forth in Apprendi and Blakely.  The California Supreme Court's citation to Black in the order denying petitioner's habeas corpus petition was clearly in reference to his claim alleging violation of his right to a jury trial as to his prior conviction.  Accordingly, the citation to Robbins applies to petitioner's claim alleging denial of his right to present evidence.

Respondent argues that the citation to Robbins indicates that petitioner's claim alleging violation of his right to a jury trial is procedurally barred.  Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the

1    judgment."  Coleman v. Thompson, 501 U.S. 722, 729 (1991); King v. LaMarque, 464 F.3d 963,

2    965 (9th Cir. 2006).  "[T]he procedural default doctrine is a specific application of the general

3    adequate and independent state grounds doctrine." Wells v. Maass, 28 F.3d 1005, 1008 (9th Cir.

4    1994); Fields v. Calderon, 125 F.3d 757, 761-62 (9th Cir. 1997).  The procedural default doctrine

5    "bar[s] federal habeas [review] when a state court declined to address a prisoner's federal claims

6    because the prisoner had failed to meet a state procedural requirement."  Coleman, 501 U.S. at

7    729-30.  A state procedural rule is considered an independent bar if it is not interwoven with

8    federal law or dependent upon a federal constitutional ruling.  Ake v. Oklahoma, 470 U.S. 68, 75

9    (1985).  A state procedural rule constitutes an adequate bar to federal court review if it was

10   "firmly established and regularly followed" at the time the state court applied it.  Ford v. Georgia,

11   498 U.S. 411, 423-24; King, 464 F.3d at 965; see also Townsend v. Knowles, 562 F.3d 1200,

12   1207 (9th Cir. 2009) ("To be adequate, a state procedural rule must be 'well-established and

13   consistently applied.'" (quoting Bennett v. Mueller, 322 F.3d 573, 583 (9th Cir. 2003)).

14            "A procedural rule can be neither well-established nor consistently applied if it is

15   not 'clear and certain.'"  Townsend, 562 F.3d at 1207 (quoting King, 464 F.3d at 965)).

16   Moreover, "[t]o constitute a procedural bar, the state's rule had to be independent and adequate at

17   the time [petitioner] purportedly failed to comply with it."  Townsend, 562 F.3d at 1206.

18            Procedural default is an affirmative defense, Gray v. Netherland, 518 U.S. 152,

19   165-66 (1996); Insyxiengmay v. Morgan, 403 F.3d 657, 665 (9th Cir. 2005), "and the state has

20   the burden of showing that the default constitutes an adequate and independent ground."

21   Insyxiengmay, 403 F.3d at 665-66; Bennett, 322 F.3d at 585.

22            Here, respondent raises the affirmative defense that petitioner's claim alleging

23   denial of his right to present evidence is procedurally barred due to the California Supreme

24   Court's denial of petitioner's habeas corpus petition raising this claim with a citation to In re

25   Robbins.  The Ninth Circuit "has recognized that California's timeliness rule became independent

26   of federal law in 1998, so [this Court] need only consider whether the California timeliness rule

1   was adequate as of [2004]."  <u>Townsend</u>, 562 F.3d at 1206-07 (citation omitted); <u>Bennett</u>, 322

2   F.3d at 582-83.

3         The burden now shifts to place that defense in issue.  Petitioner "may satisfy this

4   burden by asserting specific factual allegations that demonstrate the inadequacy of the state

5   procedure, including citation to authority demonstrating inconsistent application of the rule."

6   <u>Bennett</u>, 322 F.3d at 586.  The burden then shifts back to the government, and it bears "the

7   ultimate burden of proving the adequacy" of the relied upon ground.  <u>King</u>, 464 F.3d at 966-67

8   (quoting <u>Bennett</u>, 322 F.3d at 585-86).  "In most circumstances, the best method for petitioners to

9   place the defense in issue is to assert 'specific factual allegations that demonstrate the inadequacy

10   of the state procedure' by citing relevant cases."  <u>King</u>, 464 F.3d at 967; <u>Bennett</u>, 322 F.3d at

11   586.  If, however, a state procedural rule has previously been found inadequate, "petitioners may

12   fulfill their burden under <u>Bennett</u> by simply challenging the adequacy of the procedure; the

13   burden then shifts back to the government to demonstrate that the law has subsequently become

14   adequate."  <u>King</u>, 464 F.3d at 967.

15         In the traverse, petitioner argues that the page in <u>Robbins</u> cited by the California

16   Supreme Court indicates that his petition met one of the exceptions allowing untimely petitions.

17   Petitioner does not address the issue of whether California's timeliness rule was adequate at the

18   time he filed his petition in the California Supreme Court.  Accordingly, petitioner has not met

19   his burden of challenging the adequacy of California's timeliness rule.

20         If there is an independent and adequate state ground for the decision, the federal

21   court may still consider the claim if the petitioner demonstrates:  (1) cause for the default and

22   actual prejudice resulting from the alleged violation of federal law, or (2) a fundamental

23   miscarriage of justice.  <u>Harris</u>, 489 U.S. at 262.  The existence of cause for a procedural default

24   must ordinarily turn on whether the prisoner can show that some objective factor external to the

25   defense impeded counsel's efforts to comply with the State's procedural rule.  <u>McCleskey v.</u>

26   <u>Zant</u>, 499 U.S. 467, 493-94 (1991).  Examples of cause include showings "that the factual or

1  legal basis for a claim was not reasonably available to counsel," "that some interference by

2  officials made compliance impracticable," or "of ineffective assistance of counsel."  Murray, 477

3  U.S. at 488.  Prejudice is difficult to demonstrate:

4         The showing of prejudice required under Wainwright v. Sykes is
       significantly greater than that necessary under "the more vague

5         inquiry suggested by the words 'plain error.'"  Engle, 456 U.S. at
       135, 102 S.Ct. at 1575; Frady, supra, 456 U.S. at 166, 102 S.Ct. at

6         1593.  See also Henderson v. Kibbe, 431 U.S. 145, 154, 97 S.Ct.
       1730, 1736, 52 L.Ed.2d 203 (1977).  The habeas petitioner must

7         show "not merely that the errors at ... trial created a possibility of
       prejudice, but that they worked to his actual and substantial

8         disadvantage, infecting his entire trial with error of constitutional
       dimensions."  Frady, supra, at 170, 102 S.Ct. at 1596.

9

10  Murray v Carrier, 477 U.S. at 493-94 (1986).

11         Although different phraseology is used in the default context from that used in the

12  ineffective assistance of counsel prejudice inquiry, as stated above, the ultimate application of the

13  two prejudice inquiries is essentially similar – that is, whether the prejudice is sufficient to have

14  undermined the reviewer's confidence in the result of the trial.

15         For the reasons given by the California Court of Appeal in denying this claim set

16  forth herein, the undersigned finds that petitioner has demonstrated neither prejudice nor a

17  fundamental miscarriage of justice as a result of the alleged violation of federal law:

18         Defendant contends the trial court erred in excluding evidence during the cross-
       examination of Renita H. that Nakina Christian was a registered sex offender.

19         Christian was her former boyfriend and he had stayed with her for one week in
       1997.  Haynes testified he was never alone with her children.  Although the record

20         does not reveal defense counsel asked a question to elicit this evidence, in
       responding to defendant's demand for a Marsden hearing the court indicated it

21         had ruled in a sidebar that defense counsel could not ask the question because the
       evidence was not relevant.

22

23         The Attorney General contends defendant may not raise this issue on appeal
       because he failed to make an offer of proof in the trial court.  Defendant sought to

24         elicit this evidence on cross-examination of his ex-wife.  No offer of proof is
       necessary to obtain review of a ruling on cross-examination.  (Tossman v.

25         Newman (1951) 37 Cal.2d 52, 525; Evid. Code, § 354, subd. (c).  "If counsel in
       cross-examination were required to disclose the object of a line of questioning, the

26         witness would often be forewarned and the cross-examiner seriously hampered."
       (3 Witkin, Cal. Evidence (4th ed. 2000) Presentation at Trial, § 405, p. 494).

Defendant contends the evidence was relevant to dispel the implied notion that Marqueisha knew the sexual details revealed in her testimony only because defendant had molested her. Defendant relies on LaJoie v. Thompson (9th Cir. 2000) 201 F.3d 1166. In LaJoie, defendant's conviction for sexual offenses against a child was reversed because evidence of prior sexual assaults on the child, including rape, had been excluded due to failure to give timely notice under Oregon's rape shield law. The court found the evidence was relevant to provide an alternate explanation of the medical evidence and to show the child could have learned about sexual acts and male genitalia other than through the assault by defendant. (Id. at pp. 1173-1174.)

Here, defendant offered no evidence of a prior sexual assault on Marqueisha. He offered only evidence that Marqueisha spent one week in the company of a registered sex offender. Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code , § 210.) Evidence that Christian was a registered sex offender is not relevant to show Marqueisha's knowledge of sexual matters. Defendant could show Marqueisha's knowledge from Christian only by evidence that Christian sexually assaulted her or otherwise taught her sexual matters. Defendant offered no such evidence. He contends Christian's status shows his propensity to commit such offenses. He asserts that due process requires that he be allowed to use propensity evidence in his defense since the prosecution may use propensity evidence to convict him. We need not determine whether propensity evidence may be admitted as to someone other than defendant. Propensity evidence alone is insufficient to establish that someone committed the disputed act. (People v. Falsetta, supra, 21 Cal.4th at p. 923; People v. Davis (1995) 10 Cal.4th 463, 500-501.) Since defendant offered no other evidence relating to Christian's contact with Marqueisha, it is entirely speculative that Marqueisha learned of sexual matters from Christian. The trial court had discretion to exclude such speculative evidence. (People v. Hovey (1988) 44 Cal.3d 543, 565.)

Further, there was no reason to suspect the jury relied on the "implied notion" that Marqueisha knew the sexual details she testified to only because defendant molested her. The prosecutor did not urge the jury to make that inference. Although she was only seven or eight when the abuse began, she was 12 years old when she testified. Marqueisha's testimony about the several incidents of touching and one of intercourse did not display a sophisticated knowledge or terminology about sexual matters that required an alternative explanation.

(Respondent's Lodged Document 4, pp. 18-20.)

For the reasons set forth above, petitioner's claim alleging that he was denied his right to an present evidence is procedurally defaulted.

Conclusion

Petitioner's application for a writ of habeas corpus should be denied. If petitioner files objections, he shall also address if a certificate of appealability should issue and, if so, as to

15

1  which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the

2  applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C.

3  § 2253(c)(2).  The certificate of appealability must "indicate which specific issue or issues

4  satisfy" the requirement.  28 U.S.C. § 2253(c)(3).

5          Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a

6  writ of habeas corpus be denied.

7          These findings and recommendations are submitted to the United States District

8  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

9  days after being served with these findings and recommendations, any party may file written

10  objections with the court and serve a copy on all parties.  Such a document should be captioned

11  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

12  objections shall be filed and served within fourteen days after service of the objections.  The

13  parties are advised that failure to file objections within the specified time may waive the right to

14  appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

15  DATED:  July 9, 2010

16

17

18

19                              KENDALL J. NEWMAN
                               UNITED STATES MAGISTRATE JUDGE

20  haynes356.157

21

22

23

24

25

26